No. 25-2404

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

NATIONAL SHOOTING SPORTS FOUNDATION,

*Plaintiff-Appellant*

v.

ANTHONY G. BROWN, ATTORNEY GENERAL OF MARYLAND,

*Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Maryland,
No. 1:25-cv-01115-RDB
_____

## APPELLANT'S OPENING BRIEF
_____

JAMES W. PORTER III
JOHN PARKER SWEENEY
BRADLEY ARENT BOULT
CUMMINGS, LLP
1900 K Street, NW
Suite 800
Washington, D.C. 20006
(202) 719-8232
jporter@bradley.com

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

February 11, 2026

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Local Rule 26.1, the National Shooting Sports Foundation certifies that it does not have a parent corporation and that no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES............................................................................ iv

INTRODUCTION ........................................................................................ 1

JURISDICTION............................................................................................ 5

STATEMENT OF THE ISSUES ............................................................... 5

STATEMENT OF THE CASE...................................................................... 6

     A.    Legal and Factual Background........................................... 6

     B.    Procedural Background .................................................... 10

STANDARD OF REVIEW ......................................................................... 15

SUMMARY OF ARGUMENT.................................................................... 15

ARGUMENT ............................................................................................... 19

I.     NSSF Has Standing To Sue On Behalf Of Its Members .............................. 19

II.    The *Younger* Doctrine Is Categorically Inapplicable Here........................... 25

     A.    This Suit Does Not Ask a Federal Court to Intercede in or Enjoin Any Ongoing State Proceedings............................................. 25

     B.    NSSF Is Not a Party to the State-Court *Glock* Suit............................ 35

III.    The District Court's (Mis)application Of *Younger* Fails On Its Own Terms ...................................................................................................... 40

     A.    The Suit Against Glock Is Not "Quasi-Criminal"............................. 41

     B.    NSSF Lacks an Adequate Opportunity to Raise Its Claims in the Action Against Glock .................................................. 43

     C.    Additional Considerations Confirm that *Younger* Abstention Is Wholly Inappropriate Here............................................ 45

CONCLUSION ........................................................................................... 51

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)..........................................................................47

*Abbott v. Pastides*,
  900 F.3d 160 (4th Cir. 2018)...........................................................22

*ACRA Turf Club, LLC v. Zanzuccki*,
  748 F.3d 127 (3d Cir. 2014) ...................................................... 42, 43

*Air Evac EMS, Inc. v. McVey*,
  37 F.4th 89 (4th Cir. 2022)...................................................... *passim*

*Applied Underwriters, Inc. v. Lara*,
  37 F.4th 579 (9th Cir. 2022)............................................................41

*Ass'n for Accessible Meds. v. Frosh*,
  887 F.3d 664 (4th Cir. 2018)...........................................................47

*Ass'n of Am. Railroads v. Hudson*,
  144 F.4th 582 (4th Cir. 2025)..........................................................19

*Borowski v. Kean Univ.*,
  68 F.4th 844 (3d Cir. 2023).............................................................50

*Brown v. Kemp*,
  86 F.4th 745 (7th Cir. 2023)............................................................24

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821)........................................................26

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976).................................................................. 26, 32

*Davison v. Randall*,
  912 F.3d 666 (4th Cir. 2019)...................................................... 22, 23

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975).................................................................. 35, 36

iv

*Gibson v. Berryhill*,
411 U.S. 564 (1973) ....................................................................... 50

*Green v. City of Tucson*,
255 F.3d 1086 (9th Cir. 2001) ......................................................... 32

*Harper v. Pub. Serv. Comm'n of W. Va.*,
396 F.3d 348 (4th Cir. 2005) ........................................................... 48

*Haw. Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984) .................................................................. 27, 43

*Hebb v. City of Asheville*,
145 F.4th 421 (4th Cir. 2025) .......................................................... 19

*Heyer v. United States Bur. of Prisons*,
984 F.3d 347 (4th Cir. 2021) ........................................................... 24

*Hicks v. Miranda*,
422 U.S. 332 (1975) .................................................................. 37, 38

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..................................................................... 22, 24

*Huffman v. Pursue, Ltd.*,
420 U.S. 592 (1975) ....................................................................... 41

*In re Application & Affidavit for Search Warrant*,
923 F.2d 324 (4th Cir. 1991) ........................................................... 28

*In re Motors Liquidation Co.*,
674 B.R. 425 (Bankr. S.D.N.Y. 2025) ............................................... 41

*Jonathan R. v. Justice*,
41 F.4th 316 (4th Cir. 2022) ...................................................... *passim*

*Junior Sports Mags. Inc. v. Bonta*,
80 F.4th 1109 (9th Cir. 2023) .......................................................... 47

*Kenny v. Wilson*,
885 F.3d 280 (4th Cir. 2018) ........................................................... 22

*Kipke v. Moore*,
   2026 WL 143528 (4th Cir. Jan. 20, 2026) .......................................25

*Knight v. City of New York*,
   164 F.4th 173 (2d Cir. Jan. 13, 2026) ..............................................20

*Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*,
   791 F.2d 1111 (3d Cir. 1986) ...........................................................35

*LaFave v. Cnty. of Fairfax*,
   149 F.4th 476 (4th Cir. 2025)...........................................................23

*LIA Network v. City of Kerrville*,
   163 F.4th 147 (5th Cir. 2025)...........................................................24

*Malhan v. Sec'y U.S. Dep't of State*,
   938 F.3d 453 (3d Cir. 2019) .............................................................27

*Marks v. Stinson*,
   19 F.3d 873 (3d Cir. 1994) ........................................................ 30, 35

*Mass. Delivery Ass'n v. Coakley*,
   671 F.3d 33 (1st Cir. 2012) ................................................ 32, 37, 40

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
   457 U.S. 423 (1982)..........................................................................44

*Myles Lumber Co. v. CNA Fin. Corp.*,
   233 F.3d 821 (4th Cir. 2000) ...........................................................15

*N.J.-Phila. Presbytery of the Bible Presbyterian Church
   v. N.J. State Bd. of Higher Educ.*,
   654 F.2d 868 (3d Cir. 1981) ...................................................... 35, 51

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)..........................................................................50

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   491 U.S. 350 (1989).................................................................. passim

*NSSF v. Platkin*,
   2023 WL 1380388 (D.N.J. Jan. 31, 2023) .......................................46

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*,
　268 F.3d 255 (4th Cir. 2001) ................................................15

*Reno v. ACLU*,
　521 U.S. 844 (1997) ................................................ 48, 49

*Retail Indus. Leaders Ass'n v. Fielder*,
　475 F.3d 180 (4th Cir. 2007) ................................................19

*Richmond, Fredericksburg & Potomac R. Co. v. Forst*,
　4 F.3d 244 (4th Cir. 1993) ................................................26

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
　397 F.3d 56 (1st Cir. 2005) ................................ 29, 30, 32

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
　605 U.S. 280 (2025) ................................................ 6, 27

*Sorrell v. IMS Health Inc.*,
　564 U.S. 552 (2011) ................................................50

*Sprint Commc'ns, Inc. v. Jacobs*,
　571 U.S. 69 (2013) ................................................ *passim*

*Stivers v. State of Minnesota*,
　575 F.2d 200 (8th Cir. 1978) ................................................39

*Students for Fair Admissions, Inc.*
　*v. Pres. & Fellows of Harvard Coll.*,
　600 U.S. 181 (2023) ................................................19

*Summers v. Earth Island Inst.*,
　555 U.S. 488 (2009) ................................................19

*Telco Commc'ns, Inc. v. Carbaugh*,
　885 F.2d 1225 (4th Cir. 1989) ................................................25

*Thornhill v. Alabama*,
　310 U.S. 88 (1940) ................................................49

*Tony Alamo Christian Ministries v. Selig*,
　664 F.3d 1245 (8th Cir. 2012) ................................ 38, 39

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) .................................................25

*VonRosenberg v. Lawrence*,
   781 F.3d 731 (4th Cir. 2015) .................................................15

*Voters Organized for the Integrity of City Elections*
   *v. Baltimore City Elections Bd.*,
   451 Md. 377 (2017) .............................................................44

*Younger v. Harris*,
   401 U.S. 37 (1971) ...................................................... *passim*

**Statutes and Rule**

10 Del. Code §3930 ..............................................................7

15 U.S.C. §7901(a)(3) ...........................................................6

15 U.S.C. §7901(a)(5) ...........................................................6

15 U.S.C. §7902(a) ...............................................................6

15 U.S.C. §7903(3) ...............................................................6

15 U.S.C. §7903(5)(A) ..........................................................6

28 U.S.C. §1292(a)(1) ...........................................................5

28 U.S.C. §1331 ....................................................................5

28 U.S.C. §1343(a)(3) ...........................................................5

815 Ill. Comp. Stat. 505/2DDDD ...........................................7

Cal. Civ. Code §3273.51 ........................................................7

Colo. Rev. Stat. §6-27-104 .....................................................7

Conn. Pub. Act. No. 25-43 .....................................................7

Haw. Rev. Stat. §134-102(b)(2) ..............................................7

Md. Code Ann., Cts. & Jud. Proc. §3-2501(c) ..........................8

Md. Code Ann., Cts. & Jud. Proc. §3-2501(d) ...........................................8

Md. Code Ann., Cts. & Jud. Proc. §3-2501(f)(1)-(2) ..............................9

Md. Code Ann., Cts. & Jud. Proc. §3-2501(f)(3) ..................................8

Md. Code Ann., Cts. & Jud. Proc. §3-2502 ............................... 2, 7, 19, 20

Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)............................. 8, 47, 48

Md. Code Ann., Cts. & Jud. Proc. §3-2502(a)(1) ...................................49

Md. Code Ann., Cts. & Jud. Proc. §3-2502(b) ................................ 8, 47

Md. Code Ann., Cts. & Jud. Proc. §3-2502(c)................................. 9, 50

Md. Code Ann., Cts. & Jud. Proc. §3-2503 ........................................2

Md. Code Ann., Cts. & Jud. Proc. §3-2503(a)(1)-(2) ..............................9

Md. Code Ann., Cts. & Jud. Proc. §3-2503(b) .......................................9

N.J. Stat. Ann. §2C:58-35(a)................................................................7

Pub. L. No. 109-92, 119 Stat. 2095 (2005).................................6

Wash. Rev. Code §7.48.330 ...................................................7

Fed. R. App. P. 4(a)(1) ...................................................5

## Other Authorities

Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation Gun Violence Disaster Emergency to Build a Safer New York*, YouTube (July 6, 2021), perma.cc/8LZQ-8DP9 ................................7

Restatement (Second) of Torts (1977) ....................................49

**INTRODUCTION**

Imagine that a state enacted a new law, and the state attorney general's office sued a major industry player for allegedly violating it. If two other industry members responded to that shot across the bow by filing suit in federal court challenging the constitutionality of that new law, no one would bat an eye. So long as those industry participants attested in their federal filing that they engage in conduct that is substantially similar to the conduct that the state has already sued one industry member for engaging in, no one could seriously dispute that they have standing to pursue a federal pre-enforcement challenge. And it is hard to imagine that anyone would think the federal court should abstain from entertaining their federal constitutional challenge just because the attorney general managed to sue one industry member—out of thousands—before they filed their federal-court action.

There is no reason the result should be different if, rather than suing on their own, those two parties persuaded their trade association to file suit on behalf of both them and other association members that face the same credible threat of enforcement. Yet, according to the district court here, that makes all the difference. Indeed, in the court's view, a trade association apparently lacks standing to challenge the constitutionality of a state law on behalf of its members until one of them is sued for allegedly violating the law—but is then disabled under *Younger v. Harris*, 401 U.S. 37 (1971), from challenging the law in federal court as soon as a single member

is sued in state court for allegedly violating it. In reality, neither Article III nor *Younger* abstention creates that kind of Catch-22. This Court should reverse.

In 2024, Maryland enacted House Bill 947 ("HB947"), the Gun Industry Accountability Act. HB947 creates two new causes of action against "firearm industry member[s]" that can be used not only to enjoin the lawful sale, manufacturing, and marketing of legal firearms, but also to make industry members redress harms created by third parties' misuse of firearms—even if none of the industry members' conduct was unlawful when or where it occurred. Md. Code Ann., Cts. & Jud. Proc. §§3-2502, 3-2503. Fearing that its members would soon find themselves in HB947's crosshairs, the National Shooting Sports Foundation ("NSSF") filed suit, seeking a declaratory judgment that HB947 is preempted and unconstitutional, as well as an injunction preventing the Maryland Attorney General ("AG") from enforcing it against NSSF's members going forward. NSSF and its members had reason to fear: The AG had already enforced HB947 against one NSSF member, Glock, for manufacturing, marketing, and selling handguns that remain lawful in Maryland to this day but that the AG claims are too easy for criminals to (illegally) convert into (illegal) machineguns using (illegal) machinegun conversion devices.

While NSSF pointed to the AG's action against Glock as evidence that its members face a credible threat of prosecution (just as it would have pointed to suits

2

against a *non*-member had the AG brought any), NSSF made clear that it was not bringing this suit *on behalf of Glock*, or seeking any relief vis-à-vis that suit. NSSF instead submitted declarations from over a dozen *other* members, some of whom are direct competitors of Glock in the marketplace, attesting to why they face a credible threat of enforcement. Among other things, those declarations explain that those members not only lawfully manufacture and sell legal firearms that are patterned on the ones at issue in the *Glock* suit—and thus could at any moment face an enforcement action on the same theory the AG is pressing there—but continue to lawfully market and sell in Maryland the very handguns that the AG has claimed constitute a public nuisance under HB947. And lest there remain any doubt about whether NSSF is trying to interfere with the *Glock* suit itself, NSSF explicitly told both the AG and the district court over and over (and over) again that it is not asking the court to enjoin that state-court proceeding; the only relief it seeks is to preclude the AG from bringing *future* suits against *other* NSSF members.

Without discussing the allegations in any of NSSF's declarations, the district court held that NSSF has standing to challenge HB947 *only* on behalf of Glock, vis-à-vis the pending state-court action. Having so truncated NSSF's lawsuit, and transformed it into precisely the kind of collateral attack on an ongoing state-court enforcement action that NSSF expressly assured the court it was not pressing, the court then held that it had to abstain from adjudicating NSSF's claims under *Younger*,

3

and accordingly dismissed its suit in its entirety.  In essence, then, the court held that NSSF lacks standing to challenge HB947 on behalf of any of its over ten thousand members until the AG sues one of them—but is barred by *Younger* abstention from seeking relief for any of them as soon as the AG does.

No principle of law or logic justifies that result, let alone requires it.  NSSF plainly established standing as to members far beyond Glock, so abstention should not have come into the picture unless NSSF had sought relief vis-à-vis the *Glock* suit, which it has not done.  In fact, NSSF took the federalism-preserving step of affirmatively disavowing any relief that would interfere with the state's suit against Glock.  NSSF could not have been any clearer on this point.  And the law is equally clear:  The Supreme Court has expressly held that, when a federal suit does not request or require relief that would interfere with any ongoing state litigation, and instead just asks a federal court to decide federal issues that also happen to be pending before a state court, the federal court's "dominant instruction" is to "hear and decide [the] case," "even in the presence of parallel state proceedings." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77, 81-82 (2013).  This Court has been even more emphatic, making clear that *Younger* does not apply unless a plaintiff seeks "an interruption, an injunction, an end to the pending state proceedings." *Jonathan R. v. Justice*, 41 F.4th 316, 328 (4th Cir. 2022).

That alone confirms that the district court erred in abstaining. But even if *Younger* were on the table, the court's application of the doctrine fails on its own terms. NSSF is not a party to any state-court proceeding, and it has no opportunity to raise its arguments in the AG's litigation against Glock. So even if *Younger* were relevant, when a party that is not a state-court defendant does not seek to have any state-court proceeding enjoined, abstention would still be inappropriate. That is precisely the case here.

The decision below is wrong multiple times over. This Court should reverse.

## JURISDICTION

The district court, which had jurisdiction under 28 U.S.C. §1331 and §1343(a)(3), denied NSSF's motion for a preliminary injunction on October 21, 2025. JA918-34. NSSF timely filed a notice of appeal on November 19, 2025. JA936-37; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that NSSF lacks standing to challenge HB947 on behalf of any member other than Glock.

2. Whether the district court erred in abstaining under *Younger*.

## STATEMENT OF THE CASE

### A.   Legal and Factual Background

1. The 1990s and early 2000s saw "a spate of litigation" initiated by state and local governments trying to hold licensed manufacturers and sellers of legal firearms "liable in tort for harms 'caused by the misuse of firearms by third parties, including criminals.'" *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 285 (2025) (quoting 15 U.S.C. §7901(a)(3)).  Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 "[t]o curb such suits." *Id.*; *see* Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§7901-7903). That purpose is evident on the statute's face:  Congress declared in the text that the PLCAA's core aim is to prevent suits seeking redress from businesses engaged in lawful firearms-related commerce "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended."  15 U.S.C. §7901(a)(5).   The PLCAA thus prohibits "any person," "including any governmental entity," from bringing any "civil action" "against a manufacturer or seller of a [firearm or related] product" seeking "damages," "abatement," "injunctive … relief," "or other relief" to redress injuries "resulting from the … misuse of a [firearm or related] product by … a third party."  *Id.* §7903(3), (5)(A); *see also id.* §7902(a).

The PLCAA accomplished Congress' goal of preventing state and local governments from using tort litigation to make firearms manufacturers and sellers pay to redress the societal costs of criminals' misdeeds for a while. But not forever. In 2021, New York enacted a first-of-its-kind anti-PLCAA statute specifically designed to "reinstate the public nuisance liability for gun manufacturers" that the PLCAA forbids, and thus "right the wrong" that the state believes Congress committed "16 years" earlier in passing the PLCAA. *See* Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation Gun Violence Disaster Emergency to Build a Safer New York*, YouTube, at 35:00-38:15 (July 6, 2021), perma.cc/8LZQ-8DP9. In the four years since then, 9 states have enacted similar anti-PLCAA laws. Cal. Civ. Code §3273.51; Colo. Rev. Stat. §6-27-104; 10 Del. Code §3930; Haw. Rev. Stat. §134-102(b)(2); 815 Ill. Comp. Stat. 505/2DDDD; N.J. Stat. Ann. §2C:58-35(a); Wash. Rev. Code §7.48.330; Conn. Pub. Act. No. 25-43; Md. Code Ann., Cts. & Jud. Proc. §3-2502.

2. Maryland entered the fray in 2024 with HB947, a similar effort to revive the very nuisance and negligence theories Congress enacted the PLCAA to inter. HB947 creates two new causes of action that apply only to "firearm industry member[s]," i.e., those "engaged in the sale, manufacture, distribution, importation,

or marketing of a firearm-related product."[1]  Md. Code Ann., Cts. & Jud. Proc. §3-2501(c).  First, "[a] firearm industry member" may be held liable for "knowingly creat[ing], maintain[ing], or contribut[ing] to harm to the public" (a concept HB947 leaves undefined) "through the sale, manufacture, distribution, importation, or marketing of a firearm-related product," even if that conduct was lawful where it occurred, if it is later deemed "unreasonable under the totality of the circumstances" (another concept HB947 leaves undefined).  *Id.* §3-2502(a).

Second, HB947 imposes liability anytime a firearm industry member fails to "establish and implement reasonable controls regarding the sale, manufacture, distribution, importation, marketing, possession, and use of the firearm industry member's firearm-related products," *id.* §3-2502(b), even if the relevant product was not "[s]old, manufactured, distributed, or marketed" in Maryland, *id.* §3-2501(d) (defining "[f]irearm-related product").  The statute does not key "reasonable controls" solely to the many federal, state, and local laws and regulations with which firearms manufacturers and sellers must already comply.  *Id.* §3-2501(f)(3).  Nor does it identify what specific controls are or are not "reasonable"; instead, HB947

---

[1] "Firearm-related product" is defined as "a firearm, ammunition, a component or part of a firearm, or a firearm accessory that is … [s]old, manufactured, distributed, or marketed in the State; or … [i]ntended to be sold, manufactured, distributed, or marketed in the State."  Md. Code Ann., Cts. & Jud. Proc. §3-2501(d).

(unhelpfully) defines "reasonable controls" as a set of unidentified "policies" that must be generally "designed" to further various general aims. *Id.* §3-2501(f)(1)-(2).

The failure to abide by either of those sweeping restrictions is deemed a "public nuisance" regardless of whether the "firearm industry member acted with the intent to violate this subtitle." *Id.* §§3-2502(c), 3-2503(b). The consequences for violating HB947's sweeping terms are stark. HB947 authorizes the "Attorney General, a county attorney, or the Baltimore City Solicitor" to bring suit seeking: "Restitution"; "Compensatory and punitive damages"; "Reasonable attorney's fees and costs"; and "Any other appropriate relief." *Id.* §3-2503(a)(1)-(2). Suits under HB947 may also seek "Injunctive relief" prohibiting the industry member from continuing to engage in the conduct that gave rise to the violation—even if that conduct occurred entirely out of state, is lawful when and where it occurred, and/or is necessary to ensure that law-abiding citizens can exercise their constitutional rights, and even if the conduct was not even unlawful in Maryland when it occurred. *Id.*

3. The AG has not been shy about enforcing HB947. In February 2025, the AG joined with the Baltimore City Solicitor to sue NSSF member Glock, Inc., and its parent company Glock Ges.m.b.H (collectively, "Glock") under HB947 in the Circuit Court of Maryland. *See* JA187-238. The *Glock* suit alleges that Glock has knowingly contributed to harm in Maryland, in violation of HB947, by

manufacturing, marketing, and selling (lawful) handguns that criminals are able to (illegally) convert into (illegal) machineguns using (illegal) conversion devices called "auto sears." The suit seeks not only to make Glock pay to redress, *inter alia*, "carjackings, illegal drug sales, traffic violations, and violent crimes," but also "an order enjoining Glock from continuing to sell its easily modifiable pistols to civilian residents of Maryland." JA190 ¶9; JA192 ¶16; JA207 ¶59; JA223-24 ¶95-99.

## B.    Procedural Background

1. NSSF is "the trade association for the firearm, ammunition, and hunting and shooting sports industry." JA12 ¶11. "It has a membership of more than 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States." *Id.* Fearing that any one of its members could be the AG's next target after Glock, NSSF filed this lawsuit in federal district court, seeking a declaratory judgment that the PLCAA preempts HB947 and that HB947 violates the First, Second, and Fourteenth Amendments and the Commerce Clause. JA25-42. NSSF also sought an injunction against any future enforcement of HB947 against NSSF members. JA43.

While NSSF invoked the fact that Glock has been sued as evidence that *other* NSSF members face a credible threat of enforcement too, it made clear from the outset that it was not bringing this lawsuit *on Glock's behalf*. The *Glock* suit is instead just evidence that other NSSF members who engage in conduct similar to

the conduct for which Glock has been sued face a credible threat of enforcement—in the same way that it would be evidence of that threat if Glock were *not* an NSSF member. To illustrate that, NSSF submitted declarations in support of its preliminary injunction from more than a dozen members—not one of which was Glock—demonstrating the substantial threat of enforcement *they* face.

For instance, many retailer and distributor members attested that they market and sell the very Glock pistols that the AG claims have precipitated a public nuisance. JA50 ¶23; JA65 ¶25; JA74 ¶25; JA81 ¶25; JA90 ¶25; JA105 ¶23; JA113 ¶24; JA121 ¶23; JA136 ¶23. Members also attested to their continued manufacturing, marketing, sale, and distribution of firearms that share design characteristics with those Glocks—and that could therefore be (illegally) converted into (illegal) machineguns using an (illegal) machinegun conversion device, just the same as Glock's pistols. JA51 ¶24; JA58 ¶24; JA66 ¶26; JA74 ¶26; JA82 ¶26; JA90 ¶26; JA98 ¶25; JA105 ¶24; JA113 ¶25; JA121 ¶24; JA129-30 ¶¶25-26; JA136 ¶24; JA146 ¶24; JA154 ¶25; JA162 ¶30; JA176 ¶13; *see also* JA168-71 ¶¶11-20. Members further explained that they manufacture, sell, and market in neighboring states firearms and magazines that are banned in Maryland but are lawful across the border, creating a serious risk that they will be haled into Maryland court if anyone

unlawfully brings one of their products into Maryland.  JA51 ¶¶25; JA58 ¶24; JA66 ¶27; JA82 ¶27; JA90 ¶27; JA106 ¶25; JA114 ¶26.[2]

In addition to detailing at length its standing to sue on behalf of its members *other than* the one member against whom the AG has enforced HB947 (namely, Glock), NSSF took pains to make clear that it is "not asking [the court] to enjoin the Glock suit."  JA462.  NSSF repeated that position in its briefs and then did so *ad nauseam* at oral argument.  *See* JA462 ("We accept that there is no relief here that we can get today that will preclude [the *Glock*] suit from going forward."); JA462 ("[A]gain, we are not asking for any interference with the Glock suit."); JA462-63 (NSSF "is only asking" to enjoin "future enforcement[], not … the Glock suit"); JA461 (NSSF is seeking only "forward-looking relief" that would not apply to "the Glock suit"); JA468-69 ("I don't know if I can be more explicit, but we're not asking you to enjoin [the Glock suit]"); JA538 ("[W]e're not asking you to enjoin the Glock suit."); JA548 ("[W]e are explicitly again saying that the Glock suit can continue to go forward.").

---

[2] Fearing that the AG would follow New Jersey's lead and begin suing licensed firearm dealers for failing to confirm that purchasers of magazines and rifle ammunition are not prohibited from possessing firearms—which neither federal nor Maryland law requires, and which is often not even possible to do given limitations in the FBI's background check system—one retailer member also attested that it would cost considerable time and money to figure out how to comply with any such mandate, and that those costs could never be recouped.  JA138-39 ¶¶26-28.

2. Despite all that, the district court held that NSSF has standing *only* as a stand-in for Glock, and that the *Younger* doctrine therefore precludes adjudication of any of NSSF's claims. The court started out well enough, concluding that "NSSF can invoke representational or associational standing" because "NSSF member Glock would have standing to sue" in its own right. JA923 (formatting altered); *see* JA923-25. The court likewise easily concluded that this lawsuit is germane to NSSF's purposes since it "seeks to protect the interests of NSSF members who engage in activities related to the sale and use of their products in Maryland," JA925, and that it "does not require participation of the association's individual members," JA926.

But things then took a wrong turn. First, the court did not engage with a single one of the declarations NSSF submitted from its members attesting that they are currently engaged in specified types of conduct affected with a constitutional interest but apparently proscribed by HB947. Instead, the court summarily declared in a footnote that those declarations "presented" no "[f]acts supporting [a credible] threat of enforcement" as to any "NSSF members other than Glock," JA924 n.2—even though each demonstrated how and why other members fear they will be sued because they are engaged in essentially the same lawful conduct that the AG has claimed in the *Glock* suit violates HB947.

Having converted NSSF's suit on behalf of all members *but* Glock into a suit on behalf of *no* member but Glock, the court then held that *Younger* tied its hands. Because, in the court's eyes, NSSF's standing depended entirely on Glock, NSSF's repeated statements that it was not suing on Glock's behalf or seeking any relief that would interrupt the state-court *Glock* suit did not matter. JA926; *see also* JA932 (holding that "the practical effects of [NSSF's] lawsuit" would necessarily impact "the *Glock* proceeding in Maryland state court"). In fact, the court declared it "inconsistent, and arguably disingenuous, for NSSF to rely on Glock for purposes of satisfying its Article III standing, but distance itself from Glock for purposes of *Younger*." JA931.

Turning to application of the *Younger* doctrine in earnest, the court held that abstention was required. First, the court deemed the AG's HB947 suit against Glock to be a quasi-criminal enforcement action that "implicates vital state interests." JA928. Next, it concluded that "NSSF has an adequate opportunity to raise [its] constitutional challenges in the *Glock* suit." JA929. The court acknowledged that NSSF *itself* could not actually raise any challenges in the *Glock* suit, given Maryland's rules on intervention, which leave NSSF on the sidelines. And it nowhere suggested that any of NSSF's thousands of members could somehow intervene in that enforcement action. Instead, the court just deemed NSSF and Glock sufficiently closely aligned that Glock should have to bear the responsibility of

vindicating the interests of *all* of NSSF's many members (including Glock's competitors) in defending itself against the AG's allegations. JA929-31. Having thus concluded that the so-called *Middlesex* factors all favored abstention, the court abstained from further proceedings and "DISMISSED" NSSF's suit "without prejudice." JA934.

## STANDARD OF REVIEW

"In analyzing a decision on Article III standing," this Court reviews "the district court's factual findings for clear error" and its legal determination "de novo." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 (4th Cir. 2001). "[W]hether a case satisfies the basic requirements of abstention" likewise "constitutes 'a legal question subject to de novo review.'" *VonRosenberg v. Lawrence*, 781 F.3d 731, 734 (4th Cir. 2015) (quoting *Myles Lumber Co. v. CNA Fin. Corp.,* 233 F.3d 821, 823 (4th Cir. 2000)).

## SUMMARY OF ARGUMENT

The district court's decision to abstain from resolving NSSF's lawsuit is egregiously wrong twice over. NSSF plainly demonstrated that it has standing to press its constitutional claims on behalf of members *other than Glock*, as it submitted more than a dozen declarations detailing why *other* members credibly fear enforcement. NSSF pointed to the *Glock* suit not to show that NSSF has standing to sue on behalf of Glock itself, but only as evidence that the AG is already enforcing

HB947 against another party for engaging in the same conduct in which NSSF's members are engaged, thus confirming that they have standing to try to prevent the AG from bringing similar suits against them. And lest there be any doubt about why NSSF brought this lawsuit or what relief it is seeking, NSSF told the district court repeatedly, and in no uncertain terms, that it has no intention whatsoever of trying to use this lawsuit to interfere with the *Glock* suit that is pending in state court. NSSF is thus plainly entitled to press its federal claims in federal court.

The AG has never denied that NSSF's members face a threat of enforcement, let alone disavowed any intent to sue them. Yet the district court held—in a footnote—that, for all "NSSF members other than Glock," "[f]acts supporting" a "credible threat of prosecution" "were neither alleged in the Complaint, nor presented in support of the motion for a preliminary injunction." JA924 n.2. That is inexplicable. NSSF's declarations explained in detail that members are presently engaged and would like to continue to engage in lawful conduct (manufacturing, selling, and marketing certain firearms) that the AG has made clear he believes HB947 proscribes. JA923. The district court did not suggest that it did not believe any of those declarants, or identify any reason why the conduct in which they are engaged might be different for purposes of HB947. It just summarily declared allegations that NSSF's members are engaged in the same or substantially similar

conduct for which another industry member has already been sued under HB947 insufficient to demonstrate that they have a credible fear of enforcement.

The only way to make sense of that conclusion is as a holding that regulated entities lack standing to challenge a statute's constitutionality unless and until they have been sued for allegedly violating it. But as this Court and the Supreme Court have made clear time and again, that is not the law. Regulated entities may bring pre-enforcement challenges so long as they express an intention to engage in a course of conduct arguably affected with a constitutional interest but arguably proscribed by the statute, and their fear of enforcement is neither imaginary nor wholly speculative. NSSF easily satisfied that standard. Indeed, not even the AG contested NSSF's standing to challenge HB947 on its members' behalf. The district court's contrary decision distorts Article III, misrepresents the record, and cannot stand.

Because the court's abstention analysis was grounded on the mistaken premise that NSSF's lawsuit is really just a collateral attack on the *Glock* litigation, it cannot survive once the court's standing mistake is corrected. *Younger* abstention is an "exceptional" doctrine with a "narrow scope." *Jonathan R.*, 41 F.4th at 321. This case falls far outside it. *Younger* and its progeny direct federal courts to abstain from exercising jurisdiction over federal claims brought by state-court defendants that seek to interfere with certain state-court proceedings. The *Younger* doctrine does not, however, prohibit "parallel state and federal proceedings" over the same

subject matter. *Sprint*, 571 U.S. at 81. Abstention is appropriate only when a federal claim "risks the kind of interference *Younger* seeks to forestall: an interruption, an injunction, an end to the pending state proceedings." *Jonathan R.*, 41 F.4th at 334. Here, NSSF is not a party to any state-court action under HB947. And while one of its thousands of members (Glock) is, NSSF is not seeking to enjoin or otherwise interfere with the *Glock* suit. NSSF was explicit about this, repeating in its papers and at oral argument that it does not seek any relief that would disrupt or pretermit the AG's state-court action against Glock. *Younger* abstention thus should never have been on the table.

In all events, abstention would be wholly inappropriate here even if *Younger* were implicated. The *Glock* action does not qualify for abstention because it is not criminal or quasi-criminal. And since NSSF is not and cannot be a party to that suit, abstaining would leave NSSF no avenue to raise its federal claims in *any* forum, even though it alleges that HB947 is "flagrantly and patently violative of express constitutional prohibitions," *Younger*, 401 U.S. at 53-54. *Younger* abstention is designed to respect state courts, not to empower state actors to deprive plaintiffs of a federal forum in which to press federal claims. This Court should reverse.

**ARGUMENT**

## I.  NSSF Has Standing To Sue On Behalf Of Its Members.

To establish Article III standing to sue in a representational capacity on behalf of its members, an association must show that at least one of its members would have standing in its own right.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025).  In the pre-enforcement context, that means showing that at least one member of the association intends to take action that is arguably affected with a constitutional interest but arguably proscribed by the statute and that the threat of enforcement against them is credible.  *See Hebb v. City of Asheville*, 145 F.4th 421, 440 n.13 (4th Cir. 2025).[3]

Here, no one has ever disputed that the conduct HB947 restricts—the sale, manufacture, and marketing of firearms and related products, *see* Md. Code Ann.,

_____

[3] An association also must establish that the interests it seeks to protect are germane to its purpose and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).  The district court correctly found the latter two elements satisfied here, and the AG has never argued otherwise.  Nor could he, as NSSF is the trade association for the firearms industry, JA12 ¶11, and HB947 regulates firearm industry members exclusively, *see* Md. Code Ann., Cts. & Jud. Proc. §3-2502; pp.7-9, *supra*.  And NSSF seeks a declaratory judgment that HB947 is preempted and unconstitutional as well as an injunction preventing future enforcement of it—the prototypical forms of relief that do not require participation of individual members.  *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007).

Cts. & Jud. Proc. §3-2502—is affected with a constitutional interest. Nor could they. *See, e.g.*, *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. Jan. 13, 2026) (per curiam) ("run[ning] a commercial gun dealing business … is at least arguably affected with a constitutional interest," as "the commercial availability of firearms is often 'necessary to a citizen's effective exercise of Second Amendment rights'"). Nevertheless, the district court held that, with the singular exception of Glock, NSSF members' fears of enforcement are "imaginary or speculative." JA924 n.2. That was clearly wrong as a matter of both fact and law.

Multiple NSSF retailer and distributor members attested in sworn declarations that they are currently selling in Maryland the very Glock pistols that the AG claims are a public nuisance in violation of HB947. JA50 ¶23; JA65 ¶25; JA74 ¶25; JA81 ¶25; JA90 ¶25; JA105 ¶23; JA113 ¶24; JA121 ¶23; JA136 ¶23. NSSF also submitted declarations from members attesting that they manufacture, sell, and/or market firearms "that are substantially similar in design to the Glock pistols at issue in the Maryland AG's lawsuit against Glock and that, like Glock pistols, can illegally be equipped with an illegal MCD [i.e., machinegun-conversion device]." JA51 ¶24; JA58 ¶24; JA66 ¶26; JA74 ¶26; JA82 ¶26; JA90 ¶26; JA98 ¶25; JA105 ¶24; JA113 ¶25; JA121 ¶24; JA129-30 ¶¶25-26; JA136 ¶24; JA146 ¶24; JA154 ¶25; JA162 ¶30. And to confirm that there is nothing remotely speculative about the connection between those other firearms and the Glock pistols the AG has singled out for

opprobrium, NSSF filed the declaration of Earl Griffith, the former Chief of the Firearms & Ammunition Technology Division of the Bureau of Alcohol, Tobacco, Firearms & Explosives, who attested to their design similarity on the metric that matters for purpose of the AG's allegations against Glock—i.e., how easy it is for criminals to illegally convert them into unlawful machineguns. JA168-71 ¶¶3-20; *see also* JA176 ¶13 (identifying NSSF members by name).

To be clear, NSSF firmly believes that the fact that criminals can use illegal, third-party-manufactured devices (known as "auto sears" or "machinegun conversion devices") to illegally convert otherwise-lawful firearms into unlawful machineguns should not be a basis for liability under any law. But the AG plainly disagrees. The basic allegation in the AG's state-court action against Glock is that Glock has violated HB947 by "sell[ing], manufactur[ing], distribut[ing], import[ing], and market[ing] to civilians semiautomatic pistols that easily accept auto sears," "thereby promoting the proliferation of illegal machine guns" and "contribut[ing] to harm in Baltimore and Maryland." JA233 ¶114; *see also* JA231-34 ¶¶105-21.

Given that the AG has already sued one manufacturer under HB947 for doing something that NSSF members *have declared, under oath, that they also do*, it blinks reality to conclude that the threat that the AG will "enforce[ HB947] against them" for that conduct is merely "imaginary or speculative." JA924 n.2. "The most

obvious way to demonstrate a credible threat of enforcement in the future, of course, is an enforcement action in the past." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). Indeed, this Court has held that it ordinarily "is sufficient to establish a credible threat of enforcement" if a plaintiff "has been subject to past enforcement and [the defendant] has not 'disavowed' future enforcement." *Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019). And when the plaintiff itself has not faced an enforcement action, the natural way to demonstrate that it faces a credible threat of one is to point to an enforcement action against someone *else* for the same or substantially similar conduct. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15-16 (2010) (plaintiffs who intended to continue supporting organizations designated as foreign terrorist organizations had standing where the government had prosecuted others for similar actions). That is precisely what NSSF did.

That likely explains why the AG did not even challenge NSSF's standing. *See* JA922 n.1 (noting that the AG did not "address[] standing in briefing or [at] oral argument"). And that itself underscores NSSF's standing, for while courts obviously have an independent obligation to assess their own jurisdiction, it is a pretty strong point in favor of finding a credible threat of enforcement that the state's chief law enforcement officer has "not disavowed enforcement" against any of the parties (or, here, party's members) who assert a credible fear of prosecution when given the opportunity to do so. *Kenny v. Wilson*, 885 F.3d 280, 289 (4th Cir. 2018); *see also*

*Davison*, 912 F.3d at 678 ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future."). That is especially true when, as here, regulated entities have been very explicit about the conduct in which they are engaged and plan to continue to engage in. *Cf. LaFave v. Cnty. of Fairfax*, 149 F.4th 476, 485 (4th Cir. 2025) (holding that plaintiffs lacked standing where county "disavowed any intent to enforce the ordinance" as to the conduct in which plaintiffs alleged they wanted to engage).

Perhaps that explains the district court's abruptness on this issue. Rather than engage with the substance of NSSF's member declarations, the court elided them altogether. To be sure, the court noted that "NSSF submitted affidavits from its members declaring their 'fear' of facing liability under [HB947], and the risk of potential harm to their businesses." JA923. And it cited the relevant docket entries in a "*See*" citation. JA923. But that is all it said. It did not discuss any of the sworn testimony set forth in those declarations, let alone offer any explanation as to how it could be that regulated entities do not face a credible threat of enforcement under a state law when the enforcer of that law has already enforced it against another party for the same or substantially similar conduct and declines to disavow enforcement against any of the declarants.

"[T]he district court's minimal citations in support of [its] conclusion compared to the full evidence in the record" constitute "clear[] err[or]." *Heyer v.*

*United States Bur. of Prisons*, 984 F.3d 347, 360 (4th Cir. 2021). More fundamentally, it makes no legal sense. The court seemed to think that the *Glock* suit could not support standing against anyone but Glock because no one else has been sued. But that is, by definition, always the case in a *pre*-enforcement challenge. That is why both this Court and others have instructed that plaintiffs bringing such a challenge not only can, but *should*, point to enforcement efforts against others engaged in the same conduct to support their claims that the threat of prosecution is credible. *See, e.g.*, *Holder*, 561 U.S. at 15-16; *LIA Network v. City of Kerrville*, 163 F.4th 147, 158-59 (5th Cir. 2025) ("look[ing] to" whether "the City has pursued enforcement actions against others" "similarly situated to the plaintiff"); *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023) ("A history of enforcement proceedings against similar conduct weighs in favor of a finding that plaintiffs' fears of enforcement are well-founded."). If past enforcement efforts sufficed to give only the targets of those enforcement actions standing to sue in federal court, then it is hard to see how anyone would *ever* have standing to bring a pre-enforcement challenge (or get into a federal court at all where a state statute is concerned).

In short, the AG is already seeking to hold one firearm industry member (Glock) liable under HB947 for its "cho[ice] to continue to sell and market [allegedly] easily modified pistols to Maryland civilians." JA192 ¶15. Other firearm industry members have declared under oath that they engage in the same conduct

and intend to "continue to" do so.  Those members "need not wait to be arrested under the challenged sections of the Act before they can assert a constitutional claim." *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013).  Nor must they cease engaging in conduct affected with a constitutional interest, risk bankruptcy, or resign themselves to "live under a cloud of 'prolonged uncertainty' as to their rights." *Id.* (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989)); *see also Kipke v. Moore*, 2026 WL 143528, at *9 (4th Cir. Jan. 20, 2026).  NSSF plainly demonstrated that it has standing to press its members' effort to avoid exactly that result.

## II.    The *Younger* Doctrine Is Categorically Inapplicable Here.

The district court's decision to abstain under *Younger* and dismiss NSSF's case hinged entirely on its conclusion that NSSF could challenge HB947 only on behalf of Glock, which is wrong for all the reasons just explained.  Since NSSF plainly has standing to seek relief on behalf of all its thousands of members—and just as plainly sought relief on behalf of those members, not Glock—*Younger* has no role to play here.

### A.    This Suit Does Not Ask a Federal Court to Intercede in or Enjoin Any Ongoing State Proceedings.

1. Courts must "begin with the fundamental proposition that '[a]bstention from the exercise of federal jurisdiction is the exception, not the rule,'" and that federal courts' "obligation to hear cases properly before the[m] is 'virtually

unflagging.'" *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817 (1976)). "[F]ederal courts have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Jonathan R.*, 41 F.4th at 327 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

Those precepts do not fall by the wayside "simply because a pending state-court proceeding involves the same subject matter." *Id.* (quoting *Sprint*, 571 U.S. at 72). To be sure, the Supreme Court in *Younger* held that federal courts should typically decline "[r]equest[s]" by "federal-court plaintiff[s]" who are also "defendant[s] in a pending state criminal prosecution" "to enjoin the [state's] prosecution" against them. *Sprint*, 571 U.S. at 77; *see Younger*, 401 U.S. at 43-54. And the Court later "extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions," *Sprint*, 571 U.S. at 72, as well as "to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," *New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 368 (1989). But as the Court has taken pains to make clear, "there is no doctrine that … pendency of state judicial proceedings excludes the federal courts." *Id.* at 373. And rightly so, as to "suggest[] that *Younger* requires abstention in deference to a state judicial proceeding reviewing

legislative or executive action" just because it involves the same federal questions "would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.* at 368.

The Supreme Court has been explicit about this—and it has not been shy about policing overly aggressive abstention efforts. "In the years that followed" *Younger*'s extension "to some state civil proceedings," some courts "expanded *Younger*" far beyond its proper moorings and were "abstain[ing] too frequently." *Smith & Wesson Brands, Inc. v. Att'y Gen.*, 27 F.4th 886, 890 (3d Cir. 2022); *see also Jonathan R.*, 41 F.4th at 328 (discussing "this early era"). "[S]o the Supreme Court reined in that expansion," *Smith & Wesson*, 27 F.4th at 890, making clear that "even in the presence of parallel state proceedings, abstention [remains] the 'exception,'" *Sprint*, 571 U.S. at 81-82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)), and has a decidedly "narrow scope," *Jonathan R.*, 41 F.4th at 321.

After "*Sprint* narrowed *Younger*'s domain," *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 462 (3d Cir. 2019), the first question a court now must ask when facing an effort to invoke *Younger* abstention is whether exercising jurisdiction "risks the kind of interference *Younger* seeks to forestall: an interruption, an injunction, an end to the pending state proceedings." *Jonathan R.*, 41 F.4th at 334. If the answer is yes, then the Court must determine whether the pending state-court action fits within one of the "three categories" of "exceptional circumstances" that

"define *Younger*'s scope." *Id.* at 329 (quoting *Sprint*, 571 U.S. at 77-78); *see infra* p.40 (discussing three categories). But if the answer is *no*—i.e., if the "specific relief" the federal plaintiff seeks in federal court would *not* interrupt, enjoin, or end state-court proceedings—then *Younger* has no role to play. *Jonathan R.*, 41 F.4th at 334. As this Court explained even before *Sprint*, the *Younger* doctrine is triggered only when a "federal court has been asked to enjoin or to interfere directly in state judicial proceedings." *In re Application & Affidavit for Search Warrant*, 923 F.2d 324, 328 (4th Cir. 1991). It does not prohibit federal-court litigation that does not seek to interfere with any state-court proceeding simply because a state court may be considering the same federal questions that the federal court is asked to decide. *NOPSI*, 491 U.S. at 373. Thus, when a federal suit does not challenge any state suit or request relief that would upset state proceedings, *Younger* is off the table.

2. Those principles suffice to foreclose application of *Younger* abstention here. Notably absent from the district court's opinion is any explanation of how NSSF's lawsuit would interfere with the AG's state-court case against Glock. That omission is no oversight. NSSF never asked the court to enjoin or otherwise interfere with the *Glock* suit. Quite the opposite: NSSF repeatedly disclaimed any intention of asking the court to enjoin, pretermit, or otherwise interfere with the *Glock* suit. *See* p.12, *supra*. That is the end of the *Younger* road, as "*Younger*'s main concern has always been whether federal jurisdiction will 'unduly interfere' with pending state

proceedings." *Jonathan R.*, 41 F.4th at 332 (quoting *Younger*, 401 U.S. at 44). And a federal-court lawsuit that simply presents the same legal questions as a pending state-court action does not interfere with the state-court proceeding at all.

Indeed, the Supreme Court "noted in *NOPSI* that the federal proceeding [there] 'may well affect, or for practical purposes pre-empt, a … pending … state-court action,' yet still held *Younger* abstention inappropriate." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 71 (1st Cir. 2005) (quoting *NOPSI*, 491 U.S. at 373). *A fortiori*, "the mere possibility of inconsistent results in the future is insufficient to justify *Younger* abstention." *Id.* A federal plaintiff may pursue federal relief in federal court, despite the pendency of related state-court proceedings, so long as she "do[es] not seek to … end … [the] state proceedings." *Jonathan R.*, 41 F.4th at 333. Because NSSF made clear beyond cavil that it is not seeking to end or otherwise interrupt the state proceedings against Glock, *Younger* is categorically inapplicable.

3. Ignoring that well-settled law, the district court held that *Younger* required abstention here because of "the practical effects [resolving] this federal lawsuit" would have on the AG's *Glock* case. JA932. But rather than explain what those "practical effects" might be, the court simply declared that any "decision in this federal action will necessarily and unavoidably interfere with the *Glock* proceeding in Maryland state court." JA932.

That makes no sense, and it is not the law. The lasting lesson from cases like *Sprint* and *NOPSI* is that federal-court litigation does *not* "necessarily and unavoidably interfere with" state-court litigation involving the same subject matter. It does so only when the federal-court plaintiff actually asks the state court to interrupt, enjoin, or put an end to the state-court litigation, which NSSF did not do here. Indeed, even the "fact that a judgment in the federal suit might have collateral effects in the state proceeding is not interference for *Younger* purposes." *Marks v. Stinson*, 19 F.3d 873, 885 (3d Cir. 1994). After all, "parallel proceedings always involve a likelihood that a final merits judgment in one will effectively terminate the other." *Id.* That is why the Supreme Court made clear in *Sprint* that "[t]he pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." 571 U.S. at 73. And it is why this Court has explicitly rejected the notion that *Younger* abstention is "trigger[ed]" whenever there is parallel litigation and a risk that a federal "court might find a violation [of federal law] where the state court would not." *Jonathan R.*, 41 F.4th at 333 (quoting *Rio Grande*, 397 F.3d at 71). In short, "*Younger* applies only when the relief asked of the federal court 'interfere[s]' with the state proceedings." *Rio Grande*, 397 F.3d at 70 (alteration in original). Any other conclusion would let *Younger* "overrun the usual rule that 'the pendency of an action in a state court is no bar to proceedings

concerning the same matter in the Federal court having jurisdiction.'" *Jonathan R.*,
41 F.4th at 334 (quoting *Sprint*, 571 U.S. at 73).

The district court dismissed *Jonathan R.*, deeming its facts "easily
distinguished from the facts of this case." JA932. It is certainly true that the facts
of *Jonathan R.*—"a federal class action alleging myriad constitutional violations in
the West Virginia state foster care system," JA932—were extraordinary. But the
reasons why this Court held *Younger* inapplicable in *Jonathan R.* had nothing to do
with those idiosyncratic facts; it held *Younger* inapplicable because the relief the
plaintiffs sought did not risk "an interruption, an injunction, an end to the pending
state proceedings." *Jonathan R.*, 41 F.4th at 333-34. Even though allowing the
federal-court litigation to proceed risked creating a situation in which a federal court
would find a federal-law violation in the state system where the state courts did not,
that is not the kind of "risk" with which *Younger* is concerned. *Id.*

This case follows *a fortiori*. As explained, NSSF does not seek an injunction
against the *Glock* suit (or any other pending state-court action under HB947). *See,
e.g.*, JA462 (clarifying that NSSF is "not asking" the court "to enjoin the Glock
suit"); JA464 (making "explicitly" clear that "the Glock suit can continue to go
forward" no matter how this case is resolved). Rather than seeking "to void the basis
for" the *Glock* suit, JA933, NSSF seeks a declaratory judgment that HB947 violates
multiple constitutional provisions and is preempted, as well as a forward-looking

injunction barring the AG from bringing *new* enforcement actions under HB947 against NSSF members.  JA8-44.  A federal-court judgment granting either or both of those forms of relief would in no way "risk[] the kind of interference *Younger* seeks to forestall."  *Jonathan R.*, 41 F.4th at 334.  It would just be persuasive authority from another court confronted with similar issues that the state court could choose to follow in the *Glock* suit—or not.

That is not the stuff of *Younger* abstention, or even close.  Not even "[n]ormal res judicata effects of federal actions" suffice to "trigger *Younger*."  *Id.* at 333 (alteration in original) (quoting *Rio Grande*, 397 F.3d at 71).  Even if the ultimate judgment in a "federal proceeding 'may well … for practical purposes pre-empt … a pending … state-court action'" (if the case makes it all the way to the Supreme Court), "*Younger* abstention" is "still … inappropriate" unless the federal-court plaintiff is actually seeking to have the federal courts directly interdict the pending state-court action.  *Rio Grande*, 397 F.3d at 71 (quoting *NOPSI*, 491 U.S. at 373); *see also, e.g.*, *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 47-48 (1st Cir. 2012) (explaining that "a general declaration that [a state law] is pre-empted … is not a basis to invoke *Younger*").  "In short, as the [Supreme] Court has often repeated, the 'mere potential for conflict in the results of adjudications[]' is not the kind of 'interference' that merits federal court abstention."  *Green v. City of Tucson*, 255 F.3d 1086, 1097 (9th Cir. 2001) (quoting *Colo. River*, 424 U.S. at 816).

Ultimately, the district court seemed to think that NSSF must *really* be seeking relief vis-à-vis the *Glock* suit, even though it repeatedly and expressly disavowed doing so, because it would be "inconsistent" for NSSF to point to the *Glock* suit to substantiate its members' standing while simultaneously disclaiming any effort to interrupt that suit. JA931. The court even went so far as to suggest that it is "disingenuous" to invoke the *Glock* suit as evidence of standing while disavowing any intention of interfering with it. JA931. Once again, that reflects a fundamental misunderstanding of NSSF's standing allegations, not to mention *Younger* and its progeny.

NSSF did not point to the *Glock* suit to show that it has standing to sue *on behalf of Glock*. It pointed to that suit as evidence that it has standing to sue on behalf of thousands of *other* NSSF members, because the AG has already sued someone for engaging in conduct in which those members engage. To be sure, that someone also happens to be an NSSF member. But the *Glock* suit would be just as powerful of evidence that NSSF members engaging in similar conduct face a credible risk of enforcement even if Glock were *not* an NSSF member, as what matters is the nature of the AG's allegations in the state-court enforcement action, not the particular party against which the AG leveled them. No one would seriously think that NSSF was trying to interfere with a state-court action if it had pointed to a suit against a *non*-member to support its members' standing. The fact that Glock

does happen to be a member does not convert this suit into any more of a collateral attack. Again, whether this is a collateral attack on the *Glock* suit turns on the *relief* NSSF seeks—which is why NSSF went out its way (repeatedly) to dispel any confusion about whether it might be seeking to interfere with that state-court litigation. There is thus nothing remotely "inconsistent"—let alone "disingenuous"—about NSSF pointing to the *Glock* suit as evidence of standing while making clear that it does not seek to interfere with it. JA931.

In all events, if the district court had concerns about the "practical effects" of this case vis-à-vis the ongoing *Glock* suit, the proper course would have been to make clear—as NSSF itself has made clear—that any injunction will apply only to *future* state-court litigation involving other NSSF members, not to abstain from resolving NSSF's claims at all. As *Jonathan R.* explained, it is improper to "dismiss [a] case en masse" under *Younger* "before the district court has even had the opportunity to sketch out potential contours of relief." *Jonathan R.*, 41 F.4th at 328. "If Plaintiffs succeed on the merits, the court can draw careful lines so as not to interfere with [any] individual state-court [proceedings]" when it comes time to craft a remedy. *Id.* But when, as here, federal-court plaintiffs "are not seeking to enjoin any state judicial proceeding," and "instead" "simply desire to litigate what is admittedly a federal question in federal court," "the balance of state and federal interests tips decidedly away from abstention under *Younger*." *Marks*, 19 F.3d at

885 (quoting *Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 791 F.2d 1111, 1117 (3d Cir. 1986)). This Court can and should reverse on that ground alone.

## B. NSSF Is Not a Party to the State-Court *Glock* Suit.

Even if *Younger* had some role to play here, *Younger* abstention generally is not appropriate when the federal-court plaintiff is not a party to the parallel state-court action the defendant invokes. Here, there is no ongoing state-court proceeding involving NSSF, which "is not a party to the state *Glock* suit." JA929. *Younger* abstention is thus doubly foreclosed.

That is not to say that *Younger* may never apply when the federal plaintiff is nominally a stranger to the state-court proceeding. But "the contours of derivative preclusion in *Younger* cases" are strictly "limited." *N.J.-Phila. Presbytery of the Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.* (*NJPP*), 654 F.2d 868, 878 (3d Cir. 1981). Indeed, while the Supreme Court has "recognized" in dictum that perhaps there may be some "circumstances where 'legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them,'" JA929 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975)), it has never actually applied such "derivative" *Younger* abstention.

In *Doran* itself, the Court explicitly rejected the argument that parties "unrelated in terms of ownership, control, and management" should be treated as "so closely related that they should all be subject to the *Younger* considerations

which govern any one of them" just because they "have similar business activities and problems." 422 U.S. at 928-29. In fact, the Court went on to hold in *Doran* that, because "[n]o state proceedings were pending against either Salem or Tim-Rob at the time," those federal plaintiffs—who did not own, control, or manage "M & L," the other party to the federal suit—"were entitled to have their claims for preliminary injunctive relief considered without regard to *Younger*'s restrictions." *Id.* at 930-31.

While the district court here acknowledged that "*Doran* makes clear that alignment of interests among similar but distinct parties is not per se enough to warrant *Younger* abstention," it tried to distinguish *Doran* on the theory that NSSF and Glock are "not … two distinct business entities." JA930. That is inexplicable. NSSF and Glock are, in fact, very much "two distinct business entities." NSSF is a trade association with more than 10,000 members. JA9 ¶1. Glock is one of them, to be sure, but Glock does not own, control, or employ NSSF (and vice versa). *See Doran*, 422 U.S. at 928-31. And Glock's defense in state court is in no way dependent on its status as an NSSF member. The district court's insistence that they should nonetheless be treated as if they were the same "business entity" not only defies the record (and reality), but contravenes *Doran* itself. After all, "[i]f two businesses were not barred from pursuing a federal suit despite having interests and representation in common with a state-court criminal defendant, as was the case in *Doran*, it is difficult to see how an industry association with some interests in

36

common with a few of its members who are state-court civil defendants would be barred by *Younger* from pursuing its own federal suit." *Mass. Delivery Ass'n*, 671 F.3d at 43.

The district court's reliance on *Hicks v. Miranda*, 422 U.S. 332 (1975), *see* JA929-30, was equally misplaced. By the district court's telling, the Court in *Hicks* abstained under *Younger* "even though [the federal plaintiff] was not a party to the state action, because the federal suit would interfere with the state court prosecution, the theater had a substantial stake in the state court proceedings, and the interests of the theater and its employees were intertwined." JA930. That is incorrect. To be sure, "no state criminal proceedings were pending against [the federal plaintiffs] by name" "[w]hen they filed their federal complaint." *Hicks*, 422 U.S. at 348. (The federal plaintiffs were an adult-film theater and its owners; they sued after "two employees of the theater had been charged" with displaying an obscene movie "and four copies of [it] belonging to [the theater] had been seized." *Id.*) But that was only part of the story. Shortly after filing their federal complaint—and "prior to any proceedings whatsoever before the three-judge court"—the federal plaintiffs "were charged along with their employees in Municipal Court." *Id.* at 349-50. *That* was why *Younger* abstention applied: "[S]tate criminal proceedings [had] begun *against the federal plaintiffs* … before any proceedings of substance on the merits ha[d] taken place in the federal court." *Id.* at 349 (emphases added).

Moreover, the federal suit in *Hicks* sought "an injunction ordering the return of all copies of the film" at issue in the state-court proceeding. *Id.* at 338. "[T]he federal action" thus was not merely parallel to an ongoing state criminal proceeding against related parties; it specifically "sought to interfere with the pending state prosecution." *Id.* at 349. That is worlds away from this case. And not even that was enough to justify application of *Younger* abstention in *Hicks*: The Supreme Court suggested that abstention would *not* have been appropriate there if the federal plaintiffs had not been added to the state criminal case, and instead been left unable to "seek the return of their property in the state proceedings." *Id.* But the Court ultimately was spared from reaching that issue, because the federal plaintiffs *were* state-court defendants by the time the federal case got underway.

Besides *Doran* and *Hicks*, the district court cited only a smattering of other, nonbinding decisions. *See* JA930-31. But it overread those decisions as well. Start with *Tony Alamo Christian Ministries v. Selig* (*TACM*), 664 F.3d 1245 (8th Cir. 2012). There, a church brought a federal suit challenging the state's "seizure[]" "from [church] property" of "minor children" "who lived on [church] property." *Id.* at 1247. In that unusual setting, where the church's claims were "intertwined" with the parents' claims in a physical sense (the state came onto church property and removed children who lived there), the Eighth Circuit held that the fact that the church was not a party to the underlying proceedings in which "state courts

adjudicated … the seized children to be dependent-neglected," *id.*, did not by itself render *Younger* abstention inapplicable as to the church, *id.* at 1251-54.  That highly unusual fact-pattern does not begin to support the district court's claim that a "national association" and its many thousands of members should all be treated as one and the same for *Younger* abstention purposes.  JA930.

*Stivers v. State of Minnesota*, 575 F.2d 200 (8th Cir. 1978), is even further afield.  As the district court itself recognized, *Younger* was triggered there because the federal plaintiffs sought "to interfere with the state proceedings by requesting a stay and injunction" of those state-court proceedings despite being strangers to them. JA931.  In *Stivers*, a group of pro se plaintiffs joined a state-court defendant's collateral federal challenge explicitly seeking "a stay" of ongoing "state proceedings in their original complaint, and a temporary and permanent injunction against [the state court's] order in their amended complaint."  575 F.2d at 203.  The pro se plaintiffs "made no attempt" in federal court "to distinguish their interests from those of their co-plaintiffs who were state court parties."  *Id.*

*Stivers* is thus doubly irrelevant here.  Not only has NSSF distinguished its interests from those of Glock, but its challenge to HB947 "do[es] not seek [even] to pause—much less to end—any state proceedings."  *Jonathan R.*, 41 F.4th at 333. And while the fact that the state has enforced HB947 against Glock confirms that NSSF has standing, this federal lawsuit has never been about Glock.  It is about the

rights of the thousands of members NSSF has, in and out of Maryland, that HB947 targets.  "As explained above, the [NSSF] members who are not state court defendants—the vast majority of [NSSF]'s members—have an interest in determining the constitutionality of the state law…. As a result, [NSSF]'s basis for bringing suit is not entirely derived from those of its members who are state-court defendants, and this line of cases does not justify applying *Younger* here." *Mass. Delivery Ass'n*, 671 F.3d at 44-45.

## III.  The District Court's (Mis)application Of *Younger* Fails On Its Own Terms.

The district court's decision fails for yet another reason:  The state-court action against Glock does not qualify for *Younger* abstention in the first place, let alone satisfy the factors for applying it.  Only "three types of proceedings … warrant *Younger* abstention: (1) 'ongoing state criminal prosecutions,' (2) certain 'civil enforcement proceedings' that are 'akin to a criminal prosecution in important respects' (commonly referred to as 'quasi-criminal' proceedings), and (3) 'pending civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022) (last ellipsis in original) (quoting *Sprint*, 571 U.S. at 78-79, 81).  If a state-court proceeding fits one of those three categories, a federal court still must "consider the '*additional* factors' provided by *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 [(1982)]," before

abstaining.  *Id.*  And "even when both [of those] steps are satisfied," there are various "exceptions to the court's duty to abstain."  *Id.*  Each step goes against *Younger* here.

## A.    The Suit Against Glock Is Not "Quasi-Criminal."

This appeal does not involve a pending state *criminal* prosecution; nor does it seek to set aside any state-court order, let alone one (such as a contempt order) "uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Id.* (quoting *Sprint*, 571 U.S. at 78).  The district court did not dispute that.  Nevertheless, it deemed the *Glock* suit "quasi-criminal."  That was error.

To qualify as "quasi-criminal" for *Younger* purposes, a state-court action must "bear a close relationship to proceedings criminal in nature," i.e., it must be "'akin to a criminal prosecution' in 'important respects'"—most notably, it must seek to punish the defendant for wrongdoing.  *Sprint*, 571 U.S. at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).  "[E]ach case cited by the Supreme Court in [*Sprint*] where *Younger* abstention was valid pertained to parallel proceedings closely related to criminal statutes or were 'aimed at punishing a wrongful act through penalty or sanction.'"  *In re Motors Liquidation Co.*, 674 B.R. 425, 449 (Bankr. S.D.N.Y. 2025) (quoting *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 589 (9th Cir. 2022)).  That is a high bar.  It is not enough that a civil suit involves an "investigation and a formal complaint by the State."  *Jonathan R.*, 41 F.4th at 329.  *Contra* JA928.

The AG's state-court case against Glock does not satisfy that criterion. Quasi-criminal proceedings that "sanction[]" state-court defendants are "retributive in nature"; they seek "to punish the sanctioned party 'for some wrongful act.'" *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 135 (3d Cir. 2014) (quoting *Sprint*, 571 U.S. at 79). The *Glock* suit sounds in public nuisance, not retribution. That conclusion is inescapable given the AG's allegations. The AG does not accuse Glock of any criminal wrongdoing. Nor does he demand penalties or some other form of punishment for Glock's purportedly wrongful conduct. His complaint instead requests the civil remedies of an "injunction," contribution to a "monetary abatement fund," and "restitution." *E.g.*, JA234-35 ¶¶120-21, 126. Indeed, his action against Glock is not even confined to "wrongful acts": The AG seeks an injunction, abatement, and restitution for conduct that *is not unlawful in itself*. JA231-34 ¶¶105-21. If a tort suit seeking restitution and abatement that is predicated on not-unlawful conduct were "quasi-criminal," then practically every civil action brought by the state in tort would qualify. *But see Sprint*, 571 U.S. at 82 (*Younger* is the "exception," not the "rule.").

Of course, from the perspective of an industry member subjected to an HB947 enforcement action, that action may well feel like a form of punishment for lawful commerce in arms. But while an injunction against the sale of its lawful and most-popular handguns would no doubt produce "negative consequences" for Glock's

business (and for the Second Amendment rights of law-abiding American citizens), as would an order requiring abatement, "negative consequences are not the same thing as sanctions" under *Younger*. *ACRA*, 748 F.3d at 140. The district court's single-sentence claim to the contrary, *see* JA928, is wrong as a matter of law.

### B. NSSF Lacks an Adequate Opportunity to Raise Its Claims in the Action Against Glock.

In light of the foregoing, the "*additional* factors" discussed in *Middlesex* are neither here nor there. *Sprint*, 571 U.S. at 81. To allow the "*Middlesex* conditions" to justify abstention "[d]ivorced from their quasi-criminal context" would extend *Younger* "to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest," flouting the "dominant instruction that, even in the presence of parallel state proceedings, abstention … is the 'exception, not the rule.'" *Id.* at 81-82 (quoting *Haw. Hous. Auth.*, 467 U.S. at 236). Regardless, the district court's application of those factors failed on its own terms.

*Middlesex* directs courts to consider: "(1) whether there is 'an ongoing state judicial proceeding'; (2) whether that state proceeding 'implicate[s] important state interests'; and (3) whether that state proceeding provides 'an adequate opportunity … to raise constitutional challenges.'" *Air Evac*, 37 F.4th at 96. The third consideration—whether NSSF would have an adequate opportunity to raise its constitutional challenges in the *Glock* suit—counsels strongly against abstention, as

NSSF is not a party to that enforcement action and has no evident means of becoming one—let alone of using that action to secure relief that would protect the interests of all of its many members.

At oral argument, the district court suggested that NSSF might have "the ability to intervene" in the *Glock* suit. JA465. But as NSSF explained—and the AG ultimately conceded—"Maryland doesn't recognize associational standing," which means that "NSSF itself could not intervene as of right" in *any* Maryland state-court proceeding. JA465, 498; *see Voters Organized for the Integrity of City Elections v. Baltimore City Elections Bd.*, 451 Md. 377, 396 (2017) ("[T]his Court has not yet recognized [associational] standing."). Nor could NSSF reasonably intervene by permission in the *Glock* case. JA465-66. It is thus plain that NSSF has no opportunity, much less an "adequate opportunity[,] to present the federal challenge[s]" it wishes to present here in the state-court action to which it is a stranger. *Middlesex*, 457 U.S. at 432.

Indeed, even the district court did not claim that NSSF could *actually* raise its constitutional challenges in that suit. It instead deemed it sufficient that "*Glock* has asserted as defenses in state court the same constitutional claims that NSSF raises in this case." JA929 (emphasis added). That is the wrong question. What matters is "whether the *federal plaintiff* has an adequate opportunity to present the federal challenge" in the state-court proceeding. *Middlesex*, 457 U.S. at 432, 434 (emphasis

added).  Here, the answer is plainly no.  NSSF cannot intervene in the state-court action.  It cannot force Glock to litigate its own constitutional challenges to HB947 because, as already explained, NSSF does not control Glock or its legal defenses. And even if NSSF had some ability to direct Glock's litigation, that still would not suffice, since Glock could not obtain an NSSF-member-wide injunction against HB947's enforcement in a suit that the AG brought only against Glock.  The *Glock* suit thus does not begin to provide an adequate opportunity for NSSF to litigate its constitutional claims on behalf of its thousands of members.

### C. Additional Considerations Confirm that *Younger* Abstention Is Wholly Inappropriate Here.

In *Younger*, the Supreme Court ended its opinion by noting that even where the prerequisites for abstention seem to be met, "unusual situations" could still justify "federal intervention."  401 U.S. at 54.  This Court has taken that caveat to heart.  *E.g.*, *Air Evac*, 37 F.4th at 101.  This is precisely the kind of unusual situation where *Younger* abstention would be inappropriate even if it might be available.

At the threshold, this case presents "extraordinary circumstances" because NSSF lacks "a fair shot at advancing [its] positions" in the state-court proceeding. *Id.* at 100 & n.4.  As just explained, NSSF has no way of advancing its claims or seeking relief in the AG's *Glock* suit.  *See* pp.43-45, *supra*.  Of course, as this Court has recognized, this initial *Younger* exception "overlaps with the third *Middlesex* factor, which is something [the Court] consider[s] *before* analyzing the exceptions

to *Younger* abstention." *Air Evac*, 37 F.4th at 100 n.4. "But this overlap merely highlights the importance of deferring to the state proceedings *as long as the litigants have a fair shot at advancing their positions*" in state court. *Id.* (emphasis added). Without any shot—much less a "fair shot"—to advance its own positions in the *Glock* suit, NSSF cannot face a *Younger* bar. *See id.* at 100 n.4, 101.

Furthermore, HB947 is "flagrantly and patently violative of express constitutional prohibitions." *Younger*, 401 U.S. at 53-54 (noting that abstention would be inappropriate when a state law fits that bill). As one court has already held as to an essentially identical statute, anti-PLCAA laws like HB947 are "in direct conflict with the PLCAA's purpose," as they "subject manufacturers, distributors, dealers, and importers of firearms or ammunition products and their trade associations to civil liability for the harm solely caused by the criminal or unlawful misuse of firearm or ammunition products by others." *NSSF v. Platkin*, 2023 WL 1380388, at *7 (D.N.J. Jan. 31, 2023), *vacated on other grounds*, 80 F.4th 215 (3d Cir. 2023). And HB947's direct conflict with the PLCAA is not even the half of it.

While HB947 suffers from a number of constitutional defects, arguably the most glaring violations arise from its restrictions on constitutionally protected speech. Under HB947, a manufacturer or seller of firearms and related products may be held liable for a broad range of legal and equitable remedies if a state court deems its "marketing of a firearm-related product" to be "Unreasonable"—but *not*

"Unlawful"—and finds that it "contribute[d]" to "harm to the public." Md. Code Ann., Cts. & Jud. Proc. §3-2502(a). An industry member may also be held liable if a court determines that it failed to "establish and implement reasonable controls regarding [its] … marketing … of … firearm-related products." *Id.* §3-2502(b). HB947 thus allows licensed manufacturers and sellers of firearms and related products to be held liable in tort and made to pay to redress harms caused by third parties who misuse their lawful products, based on the not-unlawful promotion of their not-unlawful products under nebulous state-law "reasonableness" standards.

That is not remotely consistent with the First Amendment. Truthful speech promoting lawful products is protected by the First Amendment even if the product is known to have deleterious health effects. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (alcohol). The mere fact that a product is dangerous does not transform promotion of that product into a tort for which liability may be imposed. That is true *a fortiori* when it comes to products that are not just legal, but protected by the Constitution. *See, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116-17 (9th Cir. 2023) (invalidating similar marketing restriction). HB947 thus strikes at the heart of the First Amendment.

Making matters worse, not only does HB947 reach wholly out-of-state conduct—an independent problem both on the merits, *see Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018) (state laws violate the dormant

47

Commerce Clause to the extent they directly regulate wholly out-of-state conduct); *see also* JA30-33 ¶¶75-85 (raising dormant Commerce Clause claim), and when it comes to the propriety of applying *Younger*, *see Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 355-56 (4th Cir. 2005) (federal challenges to state laws that violate the dormant Commerce Clause are particularly poor candidates for *Younger* abstention). The statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted. By its terms, HB947 renders unlawful any marketing that could be said to have "contribute[d] to harm to the public," Md. Code Ann., Cts. & Jud. Proc. §3-2502(a), but it fails to define what "harm to the public" might entail. HB947 thus forces industry members to err on the side of refraining from exercising their First Amendment rights, as such incomprehensible abstractions do not articulate at all—let alone with "narrow specificity"—what kind of speech may later be deemed to have contributed to a "public nuisance." *Reno v. ACLU*, 521 U.S. 844, 871 (1997). Any advertisement for a lawful product anywhere, even if run wholly outside Maryland for a product lawful where the ad ran, can be grounds for liability if it is later deemed to have indirectly *contributed* to gun violence in Maryland. By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule, *id.*—particularly given that HB947 elsewhere contemplates full compliance with state and federal laws relating to marketing of firearms. *See* Md.

Code Ann., Cts. & Jud. Proc. §3-2502(a)(1). HB947's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech.

That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute. *Reno*, 521 U.S. at 871-72. HB947 threatens liability for any marketing that the state could later say was not subject to "reasonable controls." But under our constitutional framework, the state does not get to decide, after the fact, whether speech was reasonable. Unless commercial speech is false or inconsistent with traditional, clear, and ex ante restrictions on speech, the First Amendment protects it, even if others might deem the speech "unreasonable." And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). That inherent vagueness dooms HB947 under the First Amendment as well.

Moreover, even when speech about a product is actually false or misleading, the traditional principles that govern judicial actions for misrepresentations (including proof of reliance) have always required a substantial link between the speech and the claimed injury. *See, e.g.*, Restatement (Second) of Torts §525 (1977).

Indeed, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet HB947 does not even require proof of reliance. Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under HB947, an industry member's speech is deemed to be a "public nuisance" if it violates the terms of the statute, regardless of the intervening causes that may have ultimately caused the public harm at issue. *See* Md. Code Ann., Cts. & Jud. Proc. §3-2502(c). The First Amendment demands more, particularly of content- and speaker-based restrictions on speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011).

Against that backdrop, denying NSSF a federal forum in which to raise its federal constitutional claims would constitute irreparable harm of the highest order. "[Dismissal under *Younger*] naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." *Borowski v. Kean Univ.*, 68 F.4th 844, 854 (3d Cir. 2023) (alteration in original) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973)). But NSSF has no opportunity to press its claims in the *Glock* case. Thus, "even assuming the state proceedings here are the sort to which *Younger* applies," it would still be "not appropriate" to abstain,

as NSSF and its myriad members "will 'suffer irreparable injury' absent" federal intervention. *NOPSI*, 491 U.S. at 366 (quoting *Younger*, 504 U.S. at 43-44). For all these reasons and more, NSSF has standing to challenge HB947 on behalf of its ten-thousand-plus members and is entitled to its "choice of a [federal] forum." *NJPP*, 654 F.2d at 883.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

JAMES W. PORTER III
JOHN PARKER SWEENEY
BRADLEY ARENT BOULT
CUMMINGS, LLP
1900 K Street, NW
Suite 800
Washington, D.C. 20006
(202) 719-8232
jporter@bradley.com

s/Erin E. Murphy
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellant*

February 11, 2026

## STATEMENT REGARDING ORAL ARGUMENT

NSSF respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Fourth Circuit Rule 34(a). This case presents important questions of Article III standing, federal jurisdiction, and constitutional law. NSSF submits that oral argument would afford the parties and the Court the opportunity to explore those issues more fully.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,530 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.


February 11, 2026

s/Erin E. Murphy
Erin Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin Murphy